# Illinois Official Reports

## Supreme Court

---

### *Gregg v. Rauner*, 2018 IL 122802

---

| | |
|---|---|
| Caption in Supreme Court: | ERIC GREGG, Appellant, v. BRUCE RAUNER, Governor, Appellee. |
| Docket No. | 122802 |
| Filed | November 29, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of Saline County, the Hon. Todd Lambert, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Circuit court judgment reversed. |
| Counsel on Appeal | Thomas F. Crosby, of Winters, Brewster, Crosby & Schafer LLC, of Marion, Kolby R. Smithpeters, of Smithpeters Law Firm, LLC, of Harrisburg, and Timothy J. Crosby, of Berke, Berke & Berke, of Chattanooga, Tennessee, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, of Chicago, of counsel), for appellee. |

Justices                JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1      Defendant, Governor Bruce Rauner, terminated the appointment of plaintiff, Eric Gregg, to the Illinois Prisoner Review Board (IPRB or Board) pursuant to section 10 of article V of the Illinois Constitution (Ill. Const. 1970, art. V, § 10). Gregg filed an action in the circuit court of Saline County challenging his removal. The circuit court found that Gregg's removal was judicially reviewable and, at the close of a trial, determined that Governor Rauner wrongfully terminated Gregg's appointment. A divided panel of the appellate court reversed, holding that Governor Rauner's decision to remove Gregg from the Board was not subject to judicial review. 2017 IL App (5th) 160474. This court allowed Gregg's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)), and we now affirm the judgment of the appellate court.

¶ 2                          I. BACKGROUND

¶ 3      In May 2012, then-Governor Patrick Quinn nominated Gregg to be a member of the IPRB. Upon his nomination, the Governor's office provided Gregg with a blank form to make a statement of economic interests for the preceding calendar year. On May 20, 2012, Gregg completed and returned his statement of economic interests. In the space provided to identify any unit of government that employed him in 2011, Gregg wrote that he was mayor of Harrisburg. In the space provided to identify any gift valued over $500 and its source received in 2011, Gregg wrote "None." Gregg signed the form verification that the information provided was "true, correct and complete."

¶ 4      At the time of his nomination, Gregg was recovering from an illness. As a result, he was not actually appointed until April 26, 2013. On that date, the Governor's office filed his May 2012 statement of economic interests, which related to calendar year 2011, with the Illinois Secretary of State. Gregg did not complete a statement of economic interests relating to calendar year 2012. Gregg immediately commenced his duties as a Board member, for which he received a salary. In July 2013, Gregg resigned as mayor of Harrisburg.

¶ 5      In September 2013, Charles Will, a former Harrisburg city treasurer, notified a senior legal advisor in the Illinois Department of Corrections that Gregg failed to include in his statement of economic interests a medical lift chair received as a gift prior to the statement's April 26, 2013, filing. Ken Tupy, the IPRB legal counsel at the time, investigated the matter, but neither the IPRB nor the Governor's office took any further action. In November 2013, the Illinois Senate approved Gregg's appointment for a six-year term ending in January 2019.

¶ 6      In December 2014, Gregg filed a petition for bankruptcy pursuant to Chapter 13 of the Bankruptcy Code (11 U.S.C. § 1301 (2012)). On December 22, 2014, Gregg's bankruptcy attorney, Bradley Olson, filed a form titled "Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period." This filing indicated that Gregg received a

net monthly income of $4027 from operating a business. By his signature, Gregg declared, under penalty of perjury, that the information contained in the statement was true and correct.

¶ 7 Governor Rauner won the November 2014 general election and took the oath of office in January 2015. On August 18, 2015, Tupy received an e-mail from a reporter for the Belleville News-Democrat. The reporter asked Tupy whether Gregg's net income, as disclosed on his bankruptcy statement, indicated that Gregg violated state law prohibiting IPRB members from engaging "in any other business, employment, or vocation" (see 730 ILCS 5/3-3-1(b) (West 2014)). On August 21, 2015, Olson filed an amended statement of current monthly income that attributed the monthly business income to Gregg's wife.

¶ 8 In a letter dated September 16, 2015, Jason Barclay, general counsel, office of the Governor, informed Gregg "that the Governor's Office has received allegations that during your current term on the Prisoner Review Board, you have violated the terms of your appointment." The letter notified Gregg of two allegations. First, Gregg reported a false monthly business income in his original bankruptcy filing. Second, Gregg's statement of economic interests, filed on April 26, 2013, indicated that he did not receive any gifts in the preceding calendar year. However, the letter cited a Belleville News-Democrat article reporting that Gregg received, during the 2012 calendar year, at least two gifts each valued over $500. Barclay asked Gregg to provide the Governor's office with a written response to the allegations and advised Gregg as follows: "Your written statement should include any facts or relevant items of evidence that would help us evaluate the validity of these allegations. We will evaluate the statement upon receipt and determine whether any further action should be taken related to these allegations."

¶ 9 Gregg responded in a letter dated September 20, 2016, which he supplemented in a letter dated September 22, 2016. Regarding the bankruptcy statement of monthly income, Gregg explained that he petitioned for Chapter 13 bankruptcy due to delinquent medical bills, that his wife's business income was mistakenly listed as his own, and that Olson acknowledged the error and filed an amended statement. Regarding the statement of economic interests, Gregg explained that he had completed the statement in May 2012, that the statement related to the calendar year 2011, and that he "was never given or asked to file" another statement of economic interests that would relate to 2012. Gregg explained that he received the lift chair after he had completed the statement in May 2012. Also after Gregg completed the statement in May 2012, a June 2012 fundraiser was held to offset some of his medical bills, and the proceeds were placed in an account to which he did not have access.[1] Olsen separately sent a letter to Barclay, in which Olsen took responsibility for what he characterized as a drafting and proofreading error in completing the bankruptcy statement of monthly income.

¶ 10 In a letter dated October 2, 2015, Barclay announced the Governor's decision: "I received your September 20, 2015 letter, and effective immediately, we are terminating your appointment to the Illinois Prisoner Review Board pursuant to the Governor's removal authority in Article V, Section 10 of the Illinois Constitution." Barclay explained that Gregg verified the truth of his original bankruptcy monthly income statement and his statement of economic interests. However, Gregg's answer to the allegations "acknowledges, and therefore,

---

[1]Further, Gregg accused two individuals of supplying information to the newspaper. According to Gregg, "[t]hese individuals are filled with hate and revenge" and "were dealt with appropriately during my time as mayor."

constitutes an admission" that the filed documents "were both false." According to Barclay, not only was the original bankruptcy statement of monthly income false, but also the statement of economic interests. Barclay explained that it was not a defense that Gregg's statement of economic interests was truthful when he signed it. Rather, according to Barclay, it was false when it was formally filed with the Secretary of State 11 months after he completed it. Citing article 4a of the Illinois Governmental Ethics Act (5 ILCS 420/4a-101 *et seq.* (West 2014)), Barclay told Gregg that "it was your legal obligation, not the Governor's Office, to file your own Statement of Economic Interests and that the additional obligation to ensure that the statement is truthful and complete comes at the time of filing the document, not simply when you sign it."

¶ 11        Barclay opined that it was for law enforcement officials to decide whether Gregg's conduct constituted "willful criminal violations" or whether his "belated efforts to correct that conduct are sufficient to cure any possible criminal violations." However, Barclay concluded: "Our review of the conduct, your supporting information, and your admissions constitute a sufficient basis for your removal pursuant to Article V, Section 10 of the Illinois Constitution."

¶ 12        In a letter dated October 5, 2015, Gregg's counsel asked Barclay to identify which of "the allowable grounds for dismissal for cause the Governor is relying on to support Mr. Gregg's termination." The letter also stated that the Governor ignored Gregg's evidence that the original bankruptcy statement of monthly income was merely a clerical error that was corrected.

¶ 13        In an October 7, 2015, letter, Barclay responded to Gregg's counsel as follows. Barclay observed that section 10 of article V of the Illinois Constitution "expressly provides that the Governor may remove any gubernatorial appointee for 'incompetence, neglect of duty, or malfeasance.' " Barclay viewed his October 2 letter as clearly stating why Gregg's conduct met that constitutional standard. Regarding the original bankruptcy statement of monthly income, Barclay reasoned that Gregg either knowingly filed the false bankruptcy statement of monthly income in violation of federal law or he signed the document under penalty of perjury without reviewing it. Barclay informed Gregg's counsel that "[u]nder either formulation, Mr. Gregg's conduct constitutes either malfeasance or complete incompetence and neglect of duty. This conduct alone is sufficient for removal."

¶ 14        Regarding the statement of economic interests, Barclay reasoned that Gregg

> "either allowed Governor Quinn's office to file his 2012 Statement of Economic Interests in 2013 knowing that it was false, or he neglected to file an accurate Statement of Economic Interests in 2013 to disclose gifts he received in 2012 altogether. *** While Mr. Gregg has made efforts to correct a portion of his false bankruptcy filing, he has made no attempts to correct his false Statement of Economic Interests. Here again under either formulation, Mr. Gregg's conduct was either intentional, and therefore would constitute malfeasance, or complete incompetence and neglect of duty. This conduct alone would also be sufficient for removal."

Barclay concluded that Gregg's filing of these two false documents, considered together, "constitute solid grounds for his removal."

¶ 15        On October 14, 2015, Gregg filed his original complaint against Governor Rauner and IPRB Chairman Craig Findley. Gregg (1) sought injunctive relief, (2) alleged a violation of section 1983 of Title 42 of the United States Code (42 U.S.C. § 1983 (2012)), and (3) alleged a

cause of action for defamation/false light. Gregg sought damages, attorney fees, and costs. Gregg filed an amended complaint in which he deleted the section 1983 claim.

¶ 16    In May 2016, defendants moved to dismiss the amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2014)). In a docket entry dated June 9, 2016, the circuit court found that the amended complaint failed to state a cause of action against Findley and granted the motion to dismiss as to him. The court also denied Gregg's request for injunctive relief. However, the court rejected Governor Rauner's argument that his removal of Gregg from the IPRB was not subject to judicial review and denied Governor Rauner's motion to dismiss on that basis. The court also denied Governor Rauner's motion to dismiss the false light claim.

¶ 17    In July 2016, Gregg filed the instant second amended complaint against Governor Rauner. Gregg alleged that "he has been deprived of a property interest without due process, has lost compensation and benefits, has been embarrassed and suffered emotional distress and will continue to suffer damages as a result of Governor Rauner's illegal and wrongful removal of Plaintiff from the [IPRB]." The two-count complaint sought (1) a preliminary injunction to prohibit Governor Rauner from interfering with the exercise of Gregg's duties as an IPRB member, appointing another person to replace Gregg prior to the expiration of his term of office, or taking any retaliatory action against Gregg and (2) a declaration that the grounds for removing Gregg did not constitute cause under section 10 of article V of the Illinois Constitution, that Gregg's removal was not permissible under the constitution and pertinent statute, and that Gregg has suffered damages for which he is entitled to recover.

¶ 18    The Governor filed a section 2-619.1 motion to dismiss the second amended complaint (735 ILCS 5/2-619.1 (West 2014)) making the same arguments as in his previous motion to dismiss. On August 26, 2016, the circuit court entered an order that "adopts and incorporates its docket ruling of June 9, 2016." In September 2016, the circuit court heard the testimony of Gregg and Olson, and the parties filed a stipulation of the above-recited underlying facts.

¶ 19    On September 26, 2016, the circuit court entered a declaratory judgment in favor of Gregg and granted injunctive relief. After noting its previous ruling that Gregg's removal is judicially reviewable, the court determined that the conduct upon which Governor Rauner relied to remove Gregg did not constitute cause under the pertinent constitutional and statutory standard. The court, therefore, concluded that Governor Rauner wrongfully terminated Gregg's appointment to the IPRB, resulting in damages to Gregg.

¶ 20    A divided panel of the appellate court reversed. 2017 IL App (5th) 160474. The appellate court concluded that the exercise of the Governor's removal authority over members of the IPRB is not judicially reviewable. *Id.* ¶ 28. However, the dissenting justice concluded that a Governor's removal of an IPRB member is judicially reviewable. *Id.* ¶ 34 (Overstreet, J., dissenting). The dissenter did not address whether Governor Rauner's grounds for removing Gregg were supported by the evidence. Gregg appeals to this court.

¶ 21                                    II. ANALYSIS

¶ 22    Gregg initially contends that Governor Rauner's decision to remove him from the IPRB, pursuant to section 10 of article V of the Illinois Constitution (Ill. Const. 1970, art. V, § 10), is subject to judicial review, which the Governor opposes. If so, the parties further dispute the appropriate level of deference to be accorded to Governor Rauner's decision and whether that

decision was supported by the evidence. We view our resolution of Gregg's initial contention as dispositive.

¶ 23 Our analysis requires us to construe the relevant provisions of the Illinois Constitution. The same general principles that govern the construction of statutes also govern our construction of constitutional provisions. In construing a constitutional provision, a court's primary objective is to ascertain and give effect to the common understanding of the voters who adopted it, and courts look first to the common meaning of the words used. It is also proper to consider constitutional language in light of the history and condition of the times, the objective to be attained, and the evil to be remedied. *Blanchard v. Berrios*, 2016 IL 120315, ¶ 16; *Walker v. McGuire*, 2015 IL 117138, ¶ 16. Effective constitutional interpretation requires that the court view the constitution as a whole, construing provisions in context with other relevant provisions. *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 527 (1990). If ambiguities remain after considering the language of a constitutional provision, a court may look to the debates of the delegates to the constitutional convention. *Blanchard*, 2016 IL 120315, ¶ 16. It is appropriate to ascertain the meaning that the delegates attached to those provisions because it is only with the consent of the convention that such provisions were submitted to the voters in the first place. *League of Women Voters v. County of Peoria*, 121 Ill. 2d 236, 244 (1987). The interpretation and application of constitutional provisions presents a question of law reviewed *de novo*. *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 254-55 (2003).

¶ 24 Section 9 of article V of the Illinois Constitution provides that "[t]he Governor shall nominate and, by and with the advice and consent of the Senate, *** shall appoint all officers whose election or appointment is not otherwise provided for." Ill. Const. 1970, art. V, § 9(a). Further, section 10 of article V provides: "The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor." *Id.* § 10.

¶ 25 A. The "*Wilcox* Rule" and the "*Lunding* Exception"

¶ 26 The parties disagree as to the reviewability of the Governor's removal authority as provided by the Illinois Constitution. The appellate court stated, as a general rule, that once the Governor has identified a basis to remove someone for incompetence, neglect of duty, or malfeasance, the doctrine of separation of powers prohibits the courts from questioning the Governor's determination of cause. 2017 IL App (5th) 160474, ¶ 14 (citing *Wilcox v. People ex rel. Lipe*, 90 Ill. 186, 205 (1878)). However, according to the appellate court, where a board requires complete independence from executive control, a board member is entitled to seek judicial review of the Governor's exercise of the constitutional removal authority. *Id.* ¶ 15 (citing *Lunding v. Walker*, 65 Ill. 2d 516, 527-28 (1976)). Gregg assigns error to the appellate court's analysis of this court's *Wilcox* and *Lunding* decisions.

¶ 27 In *Wilcox*, this court was presented with a challenge to the Governor's removal of members of a public body. Similar to the 1970 Illinois Constitution, the 1870 Illinois Constitution provided: "The Governor shall nominate and, by and with the advice and consent of the Senate, *** appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for ***." Ill. Const. 1870, art. V, § 10. Correspondingly, article V also provided: "The Governor shall have

- 6 -

power to remove any officer whom he may appoint, in case of incompetency, neglect of duty, or malfeasance in office; and he may declare his office vacant, and fill the same as is herein provided in other cases of vacancy." *Id.* § 12.

¶ 28    Construing these sections together, the *Wilcox* court observed that the purpose of section 12 of article V of the 1870 Constitution was to adopt the rule that had become established under the United States Constitution with respect to presidential appointments, namely, that the Governor's power of removal was incident to and coextensive with the power of appointment. *Wilcox*, 90 Ill. at 198.[2]

¶ 29    The court next observed: "It being found that the power of removal existed in the Governor, the inquiry remains whether it was validly exercised." *Id.* at 204. The court reasoned as follows:

> "Undoubtedly, the Governor can only remove for some one of the causes specified; but the removal here was for one of these causes—incompetency. The Governor ascertained the existence of the cause here, and made the removal on account of it. The constitution is silent as to who shall ascertain the cause of removal or the mode of its ascertainment. It simply gives to the Governor the power to remove any officer whom he may appoint, in case of incompetency, etc. It follows, then, that it is with the Governor, who is to act in the matter, to determine, himself, whether the cause of removal exists, from the best lights he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision." *Id.* at 204-05.

Thus, as we observed in *Lunding*, "the true holding of *Wilcox* was not that the Governor's removal power was unlimited and unbridled" (*Lunding*, 65 Ill. 2d at 521) but rather that the power " 'was incident to and co-extensive with his power of appointment.' " *Id.* (quoting *Ramsay v. VanMeter*, 300 Ill. 193, 201-02 (1921)). Also, the removal must be based on one of the three constitutionally specified grounds. *Id.* at 520 (citing *Wilcox*, 90 Ill. at 205).

¶ 30    Surprisingly, Gregg contends that "there is no '*Wilcox* rule' in the 1970 Illinois Constitution." Gregg observes that *Wilcox* addressed the Governor's removal power pursuant to the 1870 Illinois Constitution. Therefore, according to Gregg, "[t]he *Wilcox* rule has no bearing on Gregg's right to judicial review because *Wilcox* does not apply to the 1970 Illinois Constitution."

¶ 31    This contention lacks merit. The delegates to the 1970 Constitutional Convention plainly understood the *Wilcox* construction of section 12 of article V of the 1870 Illinois Constitution: "(1) Section 12 covered any officer appointed by the Governor and not just those who were subject to senatorial confirmation; (2) that no notice or hearing was required; and (3) that the Governor's discretion was not reviewable in the courts." George D. Braden & Rubin G. Cohn,

---

[2] Section 12 of article V of the 1870 Illinois Constitution overruled *Field v. People ex rel. McClernand*, 3 Ill. 79 (1839), which held that the Governor's removal power was not to be implied as an inherent part of the executive power; rather, the Governor had only the power of removal expressly provided by the Illinois Constitution. *Lunding*, 65 Ill. 2d at 519; *Wilcox*, 90 Ill. at 198.

The Illinois Constitution: An Annotated and Comparative Analysis 286 (1969); accord Dawn Clark Netsch, *The Executive*, *in* Issues for the Illinois Constitutional Convention 16 (1970) (*Wilcox* "held that while the governor can remove only for the causes specified in the constitution (incompetency, neglect of duty, or malfeasance), it is for the governor to determine the existence of the cause, and his decision is not subject to judicial review").

¶ 32 As this court observed in *Lunding*, the delegates to the 1970 Constitutional Convention chose to retain the constitutional grounds of incompetence, neglect of duty, or malfeasance in office. During the presentation and explanation of what is now section 10 of article V, Delegate Netsch proposed that the section be amended to read: " 'The governor may remove any officer whom he appoints.' " *Lunding*, 65 Ill. 2d at 525 (quoting 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1325 (hereinafter Proceedings)). Proponents of the amendment expressly reasoned that, in light of the *Wilcox* rule of nonreview, express constitutional grounds for the Governor's removal of his or her appointees is unnecessary. However, in opposing the proposed amendment, other delegates explained the reason for providing constitutional grounds for removal. According to Delegate Friedrich: "[a]t least it does put the onus on the governor of at least having a reasonable reason for letting him go besides some political reason and so on." 3 Proceedings 1326 (statements of Delegate Friedrich). As Delegate Davis added, while express constitutional grounds for removal "does give the governor the leeway to discharge a person if he wants to bear the onus of stating that they have misbehaved in office—nevertheless, this is a deterrent to wholesale dismissals of officers of the state who should be retained throughout their terms." 3 Proceedings at 1326-27 (statements of Delegate Davis). Clearly, the 1970 Constitutional Convention retained the constitutional grounds for removal and with them the *Wilcox* rule of nonreview.

¶ 33 Also, the *Lunding* court quoted from the "Official Text with Explanation," which was submitted to the voters: " 'This is a slight revision of Article V, Section 12 of the 1870 Constitution. It means that the Governor may remove *for proper cause* any officer he appoints.' (Emphasis added.) (7 Proceedings 2709)." *Lunding*, 65 Ill. 2d at 526. The *Lunding* court determined that these grounds, specified in the 1970 Illinois Constitution, precluded "the arbitrary and unfettered whim of the Governor." *Id.* Indeed, it has long been understood that "*Wilcox* construed the removal provision of the 1870 Constitution, but it also controls the meaning of the corresponding provision of the 1970 Constitution. The two Sections are nearly identical, and it is clear that the 1970 Convention intended no change in meaning." *Adams v. Walker*, 492 F.2d 1003, 1005 (7th Cir. 1974) (plurality opinion) (applying Illinois law); see *id.* at 1009 (Stevens, J., concurring) ("as a matter of Illinois law [the plaintiff] could be removed whenever the Governor saw fit to recite the magic words, 'incompetence, neglect of duty, or malfeasance in office' "). Thus it is clear that the 1970 Illinois Constitution retains the *Wilcox* rule of nonreview.

¶ 34 However, it is equally recognized that *Lunding* established a significant, but narrow, exception to the *Wilcox* rule of nonreview. The *Lunding* court analogized the constitutional removal power of the Governor to that of the President of the United States, based on three United States Supreme Court cases. *Lunding*, 65 Ill. 2d at 521-25.

¶ 35 In *Myers v. United States*, 272 U.S. 52, 176 (1926), the United States Supreme Court held that statutory restrictions limiting the President's unrestricted power to remove executive

branch officers he had appointed were unconstitutional. The Court soon thereafter limited this expansive holding.

¶ 36        In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Humphrey was a member of the Federal Trade Commission (FTC). The enabling statute provided for a seven-year term and also provided that the President could remove any member for " 'inefficiency, neglect of duty, or malfeasance in office.' " *Id.* at 620 (quoting 15 U.S.C. § 41 (1934)). President Franklin D. Roosevelt removed Humphrey from his FTC membership simply because the President wanted his own appointees on the FTC. *Id.* at 618-19. The Court limited *Myers* to purely executive officers because they are merely units in the executive branch and "hence, inherently subject to the exclusive and illimitable power of removal" by the President. *Id.* at 627. The Court observed the following characteristics of the FTC. The FTC is nonpartisan, and it must act with complete impartiality. The FTC is not charged with the enforcement of any policy except the policy of the law. The duties of the FTC are neither political nor executive but are predominantly quasi-judicial and quasi-legislative. Its members are called to exercise the trained judgment of a body of experts informed by experience. *Id.* at 624. The Court reasoned: "Such a body cannot in any proper sense be characterized as an arm or eye of the executive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." *Id.* at 628. The Court concluded: "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named." *Id.* at 629.

¶ 37        This scenario was repeated in *Wiener v. United States*, 357 U.S. 349 (1958). President Eisenhower removed Wiener from the War Claims Commission because the President wanted his own appointees on the commission. *Id.* at 350. Discussing *Humphrey's Executor*, the Court distinguished executive branch officials from members of an independent body. "This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference." *Id.* at 353. Accordingly, "the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Commission." *Id.* The Court determined that the Commission "was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination not subject to review by any other official of the United States or by any court." (Internal quotation marks omitted.) *Id.* at 354-55. Claims before the Commission were to be adjudicated on the merits of each claim, supported by evidence and governing legal principles, by a body that was entirely free from the direct or indirect control or coercion of either the President or Congress. *Id.* at 355-56. The Court concluded:

> "Judging the *** claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution ***. The philosophy of *Humphrey's Executor*, in its explicit language as well as its implications, precludes such a claim." *Id.* at 356.

¶ 38        The *Lunding* court found the reasoning of the *Myers-Humphrey's Executor-Wiener* trilogy to be persuasive. This court viewed the considerations of "independence" in *Humphrey's Executor* and *Wiener* to be analogous to Lunding's case. *Lunding*, 65 Ill. 2d at 524-25.

¶ 39    Carefully examining the 1970 Constitutional Convention debates, the *Lunding* court determined that the delegates intended that the State Board of Elections be "highly independent." *Id.* at 526. The *Lunding* court reasoned: "If the holding of this court in *Wilcox* were extended and applied to the removal of the members of the State Board of Elections, the political independence of that body envisioned by the delegates to the constitutional convention and sought to be achieved by the legislature would be jeopardized." *Id.* at 527. Therefore, because of the distinctive and unique features of the State Board of Elections, the *Lunding* court held that the adequacy of the cause cited by the Governor for removing a member of that board is judicially reviewable. *Id.* at 528-29. The *Lunding* court repeatedly limited its holding to that case. *Id.* at 518 ("in this particular instance"), 519 ("in this case"), 529 ("in this particular factual setting").

¶ 40    We observe that the parties cite post-*Lunding* federal case law. However, the *Lunding* court did not "feel inexorably bound by Federal decisions in this matter." *Id.* at 524. Indeed, it would be difficult to import the entire body of federal removal law into section 10 of article V of the Illinois Constitution based on the significant differences between the federal and Illinois governments. For example, the federal constitution makes no reference to the mode of or grounds for removal of officers, except by impeachment. U.S. Const., art. II, § 4. In contrast, the Illinois Constitution expressly provides the specific grounds for the removal of gubernatorial appointees—incompetency, neglect of duty, or malfeasance in office. Ill. Const. 1970, art. V, § 10.

¶ 41    Another significant difference between federal and Illinois state government is found in the foundational case law earlier discussed. The President may remove at will an executive branch officer, while Congress has the power to prescribe and require good cause for the removal of a member of an agency that cannot properly be characterized as "an arm or an eye of the executive." *Humphrey's Executor*, 295 U.S. at 628. In Illinois, the Governor may remove appointed members of executive agencies only for constitutionally specified cause, the determination of which is not subject to judicial review except where the agencies' functions require political independence. *Lunding*, 65 Ill. 2d at 527-28. Accordingly, we see no reason for relying on post-*Lunding* federal decisions based on a different constitutional foundation. See, *e.g.*, *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 159 (1968).

¶ 42    However, despite the foundational differences between federal and Illinois state government, reference to post-*Lunding* federal decisions actually lends support to the *Wilcox/Lunding* framework. In *Morrison v. Olson*, 487 U.S. 654 (1988), after discussing the *Myers-Humphrey's Executor-Wiener* trilogy, the United States Supreme Court acknowledged as follows:

> "We undoubtedly did rely on the terms 'quasi-legislative' and 'quasi-judicial' to distinguish the officials involved in *Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.' The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, *but to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed*

- 10 -

*duty to 'take care that the laws be faithfully executed' under Article II."* (Emphasis added.) *Id.* at 689-90.

The Court further explained:

"[T]he characterization of the agencies in *Humphrey's Executor* and *Wiener* as 'quasi-legislative' or 'quasi-judicial' in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will. We do not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant. *But the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.*" (Emphasis added.) *Id.* at 690-91.

In the case at bar, judicial review of the Governor's removal of a member of the IPRB would be impermissible according to *Morrison* because such review would interfere with the Governor's responsibility "for the faithful execution of the laws." Ill. Const. 1970, art. V, § 8.

¶ 43    Moreover, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010), the Court stressed that the President's constitutionally conferred power to execute the laws "includes, as a general matter, the authority to remove those who assist him in carrying out his duties." Prior to holding unconstitutional the statute before it, the Court acknowledged that "we have sustained in certain cases limits on the President's removal power." *Id.* at 514.

¶ 44    These cases decided subsequent to *Lunding* describe a general executive removal power with specific exceptions thereto. Accordingly, we find nothing in post-*Lunding* federal case law that would cause us to depart from this court's *Wilcox/Lunding* framework. We now turn to whether the IPRB meets the Illinois constitutional standard.

¶ 45                    B. *Lunding* and the IPRB

¶ 46    The parties disagree as to whether the IPRB falls within the *Lunding* exception to the *Wilcox* rule. The appellate court concluded that the IPRB was not so independent a body as the State Board of Elections in *Lunding* because "there is no indication that the legislature intended the IPRB to be a neutral, bipartisan board whose duties require absolute freedom from the executive branch." 2017 IL App (5th) 160474, ¶ 22. Acknowledging that "the IPRB does perform some quasi-judicial functions," the appellate court determined that "those duties do not make the IPRB a quasi-judicial agency for which political independence is necessary for the integrity of its processes." *Id.* ¶ 25. The court concluded that "the exercise of some quasi-judicial duties by itself is insufficient to remove the agency from *Wilcox*'s general rule of judicial nonreviewability and place it within the *Lunding* exception." *Id.*

¶ 47    The dissenting justice opined that the legislature intended the IPRB to be "an independent board that is quasi-judicial in nature, tasked with hearing and deciding parole matters." *Id.* ¶ 33 (Overstreet, J., dissenting). He posited that "the IPRB was established to be neutral, bipartisan, and independent in the performance of its significant responsibilities." *Id.* ¶ 34. He reasoned that "[t]his need for political independence to discharge quasi-judicial duties supports the conclusion that *** a Governor's decision removing an IPRB member is subject to judicial review." *Id.*

¶ 48    We agree with the appellate court majority. The IPRB does not share the unique characteristics of the State Board of Elections, an agency that requires a high degree of political independence, that led this court in *Lunding* to carve out an exception to the general rule of judicial nonreview. Initially, the *Lunding* court deemed it significant that the "State Board of Elections, unlike most other State agencies, boards, and commissions, is constitutionally mandated." *Lunding*, 65 Ill. 2d at 526 (citing Ill. Const. 1970, art. III, § 5). By creating an independent body within the executive branch, the framers of the 1970 Illinois Constitution intended to supersede the operation of the *Wilcox* rule and alter the structure of the executive branch. *Id.* at 526-27. In contrast, the Illinois Constitution neither creates the IPRB nor even requires its establishment. Rather, the General Assembly established the IPRB, separate from the Department of Corrections, in article 3 of the Unified Code of Corrections (Code of Corrections). 730 ILCS 5/3-3-1 *et seq.* (West 2014).

¶ 49    Additionally, in creating the State Board of Elections, the Illinois Constitution mandated that "[n]o political party shall have a majority of members of the Board." Ill. Const. 1970, art. III, § 5. Implementing the constitutional mandate, the legislature provided for an elaborate membership structure ensuring strict party balance and nonpartisanship. See 10 ILCS 5/1A-2 (West 2014) (providing that the State Board of Elections shall consist of eight members; four of whom shall be Cook County residents and four of whom shall be state residents outside of Cook County; of the four members from each area of required residence, two shall be affiliated with the same political party as the Governor, and two shall be affiliated with the political party whose nominee for Governor in the most recent general election received the second highest number of votes). In contrast, the IPRB has no requirement of strict party balance. The legislature provided for an odd number of Board members, 15, and expressly contemplated that the Board could function with a partisan majority. 730 ILCS 5/3-3-1(b) (West 2014) ("No more than 8 Board members may be members of the same political party.").

¶ 50    Gregg finds it significant that section 10 of article V of the Illinois Constitution provides three grounds for removal—incompetence, neglect of duty, or malfeasance in office (Ill. Const. 1970, art. V, § 10)—while section 3-3-1(c) of the Code of Corrections now provides, "[a]ny member may be removed by the Governor for incompetence, neglect of duty, malfeasance or inability to serve." 730 ILCS 5/3-3-1(c) (West 2014). Gregg notes that this section formerly provided: "Any member may be removed by the Governor *for cause shown.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 38, ¶ 1003-3-1(c). However, the General Assembly amended this provision to enumerate specific grounds for gubernatorial removal, mirroring the constitutional grounds and adding "inability to serve." Ill. Rev. Stat. 1989, ch. 38, ¶ 1003-3-1(c). Gregg argues that this enumeration of statutory grounds for removal reflects the legislative intent to insulate the IPRB from gubernatorial influence and thereby place the IPRB within the *Lunding* exception.

¶ 51    We disagree. This amendment did not align the characteristics of the IPRB any nearer to those of the State Board of Elections that the *Lunding* court found dispositive. We cannot see how incorporating the constitutional grounds for removal into the statute, and adding the additional ground of inability to serve, rendered the IPRB so independent as to subject the Governor's constitutional removal for cause to judicial review.

¶ 52    Also, the IPRB is not one of those rare agencies whose functions require complete independence from gubernatorial influence. The Code of Corrections lists the main functions

of the IPRB: (1) the paroling authority for persons sentenced prior to 1977; (2) the board of review for cases involving revocation of sentence credits or a suspension or reduction in the rate of accumulation of credits; (3) the board of review and recommendation for the Governor's exercise of executive clemency; (4) the authority for establishing release dates for certain prisoners; (5) the authority for setting conditions for parole and mandatory supervised release; and (6) the authority for determining whether violation of aftercare release conditions by delinquent minors warrants revocation of aftercare release. 730 ILCS 5/3-3-1(a) (West 2016). This court has long recognized that the IPRB has two separate general functions: acting as the Governor's agent in hearing applications for executive clemency and sitting as an administrative body making final decisions in parole matters. *People ex rel. Abner v. Kinney*, 30 Ill. 2d 201, 205 (1964).

¶ 53    Executive clemency is a prime example of how the IPRB works closely with the Governor, rather than requiring independence and insulation therefrom. Section 12 of article V of the Illinois Constitution provides: "[(1)] The Governor may grant reprieves, commutations and pardons, after conviction, for all offenses on such terms as he thinks proper. [(2)] The manner of applying therefore may be regulated by law." Ill. Const 1970, art. V, § 12. The first provision defines the Governor's power and does not restrict the Governor's power to act. The second provision allows the legislature to regulate the application process and is not a limitation of the Governor's power. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 467-68 (2004). Pursuant to this section, the legislature exercised its authority by enacting section 3-3-13 of the Code of Corrections, which provides the application process for clemency. 730 ILCS 5/3-3-13 (West 2014). The IPRB receives clemency petitions, conducts hearings thereon, and makes confidential written recommendations to the Governor. The Governor decides each application and communicates the decision to the Board, which relates the decision to the petitioner. *Id.* This process demonstrates that the IPRB is an executive branch agency that aids the Governor in the exercise of a constitutionally specified executive power.

¶ 54    Further, the other general function of the IPRB, sitting as an administrative agency making final decisions regarding parole matters, does not render the Board so independent as to fall within the *Lunding* exception. It is quite established that the parole release decision is so different from traditional judicial decision making that it cannot be considered a typical, quasi-judicial decision of an administrative agency. *Hanrahan v. Williams*, 174 Ill. 2d 268, 278-79 (1996) (and cases cited therein). "The State agency clothed with the power to administer the Parole Act does not perform judicial functions." *People v. Nowak*, 387 Ill. 11, 14 (1944).

¶ 55    Gregg is correct that IPRB functions include deciding certain matters based on disputed facts. See, *e.g.*, 730 ILCS 5/3-3-1(a)(5) (West 2014) (deciding whether conditions of parole or mandatory supervised release has been violated); *id.* § 3-3-2(a)(4) (deciding cases brought by Department of Corrections against prisoners for alleged violations of department rules). However, those duties do not render the IPRB the rare type of quasi-judicial agency for which political independence is essential to ensure the probity of its functions, such as the FTC in *Humphrey's Executor*, 295 U.S. at 624, or the War Claims Commission in *Wiener*, 357 U.S. at 354-55. Rather, IPRB functions include making administrative determinations that are sometimes based on disputed facts, like most other executive branch administrative agencies.

¶ 56    As a result of *Lunding*, when presented with a challenge to the Governor's constitutional removal for cause, a court must determine whether the General Assembly intended the public entity, of which the complainant is a member, to be so politically independent that the Governor's removal should be subject to judicial review. *Lunding*, 65 Ill. 2d at 527-28. This determination necessarily depends on the facts of each case. *Id.* at 529. Notably, in the 42 years subsequent to *Lunding*, only one other Illinois administrative body has been judged to fall within the *Lunding* exception, allowing judicial review of the Governor's constitutional removal for cause. *Ford v. Blagojevich*, 282 F. Supp. 2d 898, 904-05 (C.D. Ill. 2003) (applying *Lunding*, holding that members of the Illinois Industrial Commission entitled to same protection from Governor's constitutional removal power as members of State Board of Elections). We conclude that the IPRB does not meet this stringent constitutional standard. Accordingly we hold that Governor Rauner's decision to remove Gregg from the IPRB is not subject to judicial review.

¶ 57    As we earlier noted, the parties present additional arguments pertaining to the appropriate level of deference to be accorded to Governor Rauner's decision and whether that decision was supported by the evidence. However, we have held that Governor Rauner's decision to remove Gregg from the IPRB is not subject to judicial review. "We will not decide an issue that has no bearing on the case before this court." *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990). Because these arguments are not necessary to our disposition of this case, we do not address them. See, *e.g.*, *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 35.

¶ 58                                   III. CONCLUSION
¶ 59    For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 60    Appellate court judgment affirmed.
¶ 61    Circuit court judgment reversed.